IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| SELENA A. SCOTT, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BANK OF AMERICA, *et al.*, | : | NO. 13-987 |
| Defendants. | : | |

**MEMORANDUM**

PRATTER, J.                                                                                                               NOVEMBER 21, 2013

In her Amended Complaint, Selena Scott brings several claims against Bank of America, Bank of America Consumer Credit, Bank of America Funding, and Cavalry SPV based on attempts to collect on her defaulted credit card account after the receivables of that account had been securitized. Defendants have moved to dismiss each of her claims. For the following reasons, the Court will grant Defendants' motions and dismiss Ms. Scott's Amended Complaint.

**BACKGROUND**

On October 4, 2005, Ms. Scott opened a Bank of America credit card account for "personal and household purposes." At various times she had a debit balance on the account. Ms. Scott asserts that when Bank of America securitized its credit card receivables by selling them to a trust in 2006, it relinquished ownership of her account. Therefore, she alleges, Bank of America was neither entitled to continue to accept payments on the account, nor was it entitled, once her account was in default, to sell her account to Defendant Cavalry.

In 2011, after Ms. Scott had defaulted on her account, Bank of America allegedly sold the account to Cavalry. Cavalry then filed a collection action against Ms. Scott in an attempt to

collect the defaulted credit card debt.[1]  After Ms. Scott's attorney called Cavalry's counsel and informed him that Bank of America "was not the real party in interest," Cavalry withdrew that case.  *See* Am. Compl. ¶¶ 34-35.

In her initial Complaint, Ms. Scott, on behalf of herself and ostensibly on behalf of others similarly situated, filed suit against Cavalry, Bank of America, Bank of America Consumer Credit, and Bank of America Funding, alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692p, and the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), 73 P.S. §§ 2270.1-2270.6, as well as state law claims for unjust enrichment and intentional infliction of emotional distress.  After Defendants filed motions to dismiss that Complaint, Ms. Scott filed an Amended Complaint asserting violations of the FDCPA, the FCEUA, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1 thru 201-9.3, as well as state law unjust enrichment and negligent infliction of emotional distress claims.  Defendants again moved to dismiss.

**LEGAL STANDARD**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint.  Although Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and quotations omitted) (alteration in

---

[1]  The Amended Complaint's allegations regarding who filed the collection action are somewhat confusing.  At one point, Ms. Scott alleges that Cavalry filed the action "on behalf of Bank of America." *See* Am. Compl. ¶ 30.  However, the complaint in the collection action makes clear that the lawsuit was filed by Cavalry itself.  *See* Compl. Ex. A.

original), the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. (citation omitted).

To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555 (citations omitted). The question is not whether the claimant will ultimately prevail but whether the complaint is "sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 131 S.Ct. 1289, 1296 (2011) (citation omitted). An assessment of the sufficiency of a complaint is thus "a context-dependent exercise" because "[s]ome claims require more factual explication than others to state a plausible claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (citations omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must only consider those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)); *see also Twombly*, 550 U.S. at 555 (stating that courts must assume that "all the allegations in the complaint are true (even if doubtful in fact)"); *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("[A] court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."). The Court also must accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party. *See Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989); *see also Revell v.*

*Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010). That admonition does not demand the Court turn its back on reality. The Court need not accept as true "unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183–84 (3d Cir. 2000) (citations and quotations omitted), or a plaintiff's "bald assertions" or "legal conclusions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (citations and quotations omitted).

**DISCUSSION**

Defendants move to dismiss each of Ms. Scott's claims, advancing multiple arguments for dismissal for each individual cause of action. Ms. Scott, rather than addressing many of the Defendants' legal arguments directly, spends several pages of her opposition explaining the securitization process and, without any legal citations, explaining why she believes that securitizing credit card receivables necessarily divests the issuing company of any ownership interest in the account. Because each of Ms. Scott's claims depends on the validity of her securitization theory, the Court will focus on that issue.[2]

Defendants[3] argue that courts across the country, in both mortgage and credit card cases, have rejected unequivocally the idea that securitizing receivables changes the relationship between a debtor and a creditor. *See, e.g., Batchelor v. Wells Fargo Bank, N.A.*, No. 12-14835, 2013 WL 1499583, at *3 (E.D. Mich. Mar. 15, 2013) ("Plaintiff's argument – that Defendant's securitization of his loan relieved him of his obligation to pay on the note – has been consistently

---

[2] Each of Ms. Scott's claims depends upon the theory that when the receivables from her account were securitized, the Bank Defendants were divested of ownership of her account and therefore had nothing to sell to Cavalry, making Cavalry's efforts to collect on the debt fraudulent. Thus, if securitization does not have the effect on the Bank Defendants' ownership interest that Ms. Scott claims it does, all of her claims fail.

[3] Although only the Bank Defendants directly addressed the securitization theory, Cavalry joined in the Bank Defendants' argument both at oral argument and in its supplemental briefing filed after oral argument.

rejected by judges in this district and nationwide."); *Bhatti v. Guild Mortgage Co.*, No. 11-0480, 2011 WL 6300229, at *5 (W.D. Wash. Dec. 16, 2011) ("Securitization merely creates a separate contract, distinct from Plaintiffs' debt obligations under the Note, and does not change the relationship of the parties in any way."); *Tostado v. Citibank (South Dakota), N.A.*, No. 09-549XR, 2010 WL 55976, at *3 (W.D. Tex. Jan. 4, 2010) (finding that the language in Citibank's pooling and servicing agreement made clear that Citibank only securitized the *receivables* to plaintiff's account and that therefore Citibank retained ownership of the accounts themselves and could collect on those accounts once they were in default); *Shade v. Bank of America*, No. 08-1069, 2009 WL 5198176, at *3-4 (E.D. Cal. Dec. 23, 2009) ("Plaintiff has also failed to demonstrate how defendants' efforts to collect on an overdue credit card account constitutes fraud, even where the account may have been securitized . . . [P]laintiff has provided no binding legal authority for his theory that because Bank of America securitized the account balances, it was no longer the real party in interest and could not assign the debt for collection to other defendants").[4]

More specifically, the Bank Defendants point to the Pooling and Servicing Agreement attached to Plaintiff's Complaint and referenced in her Amended Complaint,[5] which, like the agreement discussed in *Tostado*, 2010 WL 55976, makes clear that only receivables, not entire

---

[4] Moreover, in two cases in this district, Judge Shapiro dismissed very similar claims, without much discussion. *See Lance v. Weltman, Weinberg & Reis Co.*, Civil Action No. 11-1254 (E.D. Pa. June 8, 2012); *Ludwig v. Apothaker & Assocs.*, Civil Action No. 12-1129 (E.D. Pa. July 31, 2012). Those cases are distinguishable, in that the original issuers of the credit cards were the ones trying to collect on the debts. In those cases, rather than directly address the securitization theory on which the plaintiffs relied, the court held that the credit card issuers and their agents were not debt collectors under the FDCPA and then refused to exercise jurisdiction over any of the related state law claims in the absence of any federal claims.

[5] In paragraph 22 of Plaintiff's Amended Complaint, Ms. Scott refers to the Agreement and states that it is attached as Exhibit B. However, no exhibits were filed with Plaintiff's Amended Complaint. The Agreement was attached as Exhibit B to Plaintiff's original Complaint; it appears that the failure to attach the exhibit to the Amended Complaint was merely an oversight. Thus, the Court will consider this document as though it had been attached to the Amended Complaint.

accounts, are sold in the securitization process. *See* Compl., Ex. B, at § 2.01 "Conveyance of Receivables." Even if, somehow, ownership of the account without the receivable was not enough, the Pooling and Servicing Agreement provides that if an account falls into default and has all its receivables charged off as uncollectible, those receivables are automatically ejected from the trust and sold back to the Bank Of America entity that originated them. *See id.* at §§ 2.04 (d)(ii) and (iii).

Ms. Scott fails to meaningfully distinguish the many cases cited by the Defendants that hold that securitizing receivables has no impact on the relationship between the debtor and creditor. For instance, Ms. Scott attempts to distinguish *Tostado*, 2010 WL 55976, by saying that in that case the agreement cited states that the master trust owns the receivables and that the Agreement here does not have the same language, despite the Bank Defendants' citations to language similar to that found to be dispositive in *Tostado*.[6] *See* Compl., Ex. B, at § 2.01 "Conveyance of Receivables." She also argues that the cases are somehow different simply because the plaintiffs in the cited cases were *pro se*.

In her supplemental briefing, Ms. Scott attempts to salvage her theory by insisting that in mortgage cases, only the trustee or noteholder can file a foreclosure suit. She does not cite to any mortgage cases that directly contradict the ones cited by the Defendants, any cases that directly discuss securitization and its effects on ownership,[7] or any cases involving credit card securitization. She does cite to one case in which the trustee of a mortgage securitization trust was found to be the real party in interest in a foreclosure action because it held both the mortgage

---

[6] She also states that *Tostado* was wrongly decided, without citing to any law that contradicts the holding in that case.

[7] Indeed, the Court was unable to find a single federal case endorsing Ms. Scott's securitization theory.

and the note. *See, e.g., In re Janice Walker*, 466 B.R. 271 (Bankr. E.D. Pa. 2012). Ms. Scott does not, however, explain how that case has any bearing on the present case, how the facts in that case relate to the facts here, or how that case relates to the cases cited by the Defendants.[8] Similarly, she cites *Wells Fargo Bank v. Lupori*, 8 A.3d 919 (Pa. Super. 2010), for the proposition that the mortgagee is the "real party in interest in a foreclosure action." *Id.* at 922 n.3. Once again, however, she fails to explain how this has any bearing on her securitization theory or on credit card agreements like the one she entered into with Bank of America.

As to the language of the Pooling and Servicing Agreement relied upon by the Bank Defendants, Ms. Scott claims that, even in light of the automatic reversion language regarding accounts in default, the Bank Defendants were required to file "a [Uniform Commercial Code, "U.C.C."] sales form with the State." She cites no authority for this supposed requirement in her opposition brief. More to the point, her Amended Complaint is silent as to this issue – at no point in her Amended Complaint does she allege that the Bank Defendants were required to file any U.C.C. forms, let alone that they failed to do so.

At oral argument and then in supplemental briefing, counsel for Ms. Scott pointed to two provisions in the Agreement which she claims require such a filing. Exhibits G and H to the Agreement, however, are merely sample forms to be used when reconveying or removing receivables from the Trust. Given that the forms in these exhibits require the reconveyance or removal of at least $100,000 of receivables, it does not appear that they bear any relation to the automatic ejection of defaulted receivables. Ms. Scott also cites a provision of the Pennsylvania U.C.C. which she claims requires the filing of a termination statement to remove receivables

---

[8] In *Walker*, 466 B.R. 271, the court held that the debtor did not have standing to challenge whether the creditor had violated a pooling and servicing agreement and consequently had acted under a defective assignment of the note and mortgage. *Id.* at 285-86. If anything, this holding seems to support the Defendants, not the Plaintiff, as Ms. Scott is attempting to base her claims at least in part on whether the Bank Defendants complied with the Pooling and Servicing Agreement in this case.

7

from the Trust. Beyond citing to a Pennsylvania bankruptcy case that held that the Pennsylvania U.C.C. applied to a promissory note that was held by a securitization trust, she does not explain why a Pennsylvania statute would apply to the Agreement in this case, particularly when it is, by its own terms, governed by Delaware law. *See Walker*, 466 B.R. 271. Furthermore, the comments to the Pennsylvania U.C.C. section cited by Ms. Scott, as well as the comments to the related Delaware U.C.C. provision, state that the filing of a termination statement is not required unless the debtor demands it. *See* 13 Pa.C.S.A. § 9513, cmt. 2 ("Because most financing statements expire in five years unless a continuation statement is filed (Section 9-515), no compulsion is placed on the secured party to file a termination statement unless demanded by the debtor. . ."); 6 Del. C. § 9-513, cmt. 2 (same).[9]

In short, then, Ms. Scott has not provided the Court with adequate allegations or legal arguments to conclude that the Bank Defendants violated any laws or contract provisions in their handling of her account or that they did not have the right to sell her defaulted account to Cavalry. Thus, the Court will dismiss her Amended Complaint in its entirety.

**CONCLUSION**

For the foregoing reasons, the Court will grant Defendants' Motions to Dismiss. An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

---

[9] An exception is made for security interests in consumer goods—in those cases, the filing of a termination statement is required. *See* 13 Pa.C.S.A. § 9513, cmt. 2; 6 Del. C. § 9-513, cmt. 2. Although Ms. Scott used her credit card, in part, to buy consumer goods, any security interest in her credit card receivable would not be a security interest in consumer goods.